This is In Re the Marriage of Moss with Mr. Farrington and Mr. Pruitt, is that right? That's correct, sir. Counsel, are you ready to proceed? Yes, thank you. This weekend I was watching the Cardinals play a game at Atlanta. I was watching it on TV and there was a pitch from one of our pitchers that was clearly out of the strike zone. It was low and inside and the umpire called it a strike. There was like a gasp in the stadium to hear it. And I knew it was a ball, everybody was a ball, but he called it a strike. The player was unhappy with it and said a few words, I guess that was his form of appeal. And he was thrown out of the game because you can't, in baseball you can't appeal a ball or strike. But afterwards they put that little template on it to show the strike zone and sure enough it was a ball and the umpire blew the call. That's the rule of baseball. Unlike baseball, we have the right of appeal, to appeal a decision by the court. And the, in this case, the template as it's put over it, this case we believe shows that the court called a ball a strike. And that it was a mistake and it was a mistake based upon two things. One, the testimony of the court appointed child custody evaluator and also the court's decision with regard to visitation. Like baseball we have rules, a protocol we follow and we have to file pleadings in a certain order and we have to file them at a certain time. And we do these things in trial and it comes to a hearing and we have rules of civil procedure, rules of evidence. Doctors have rules they follow, it's a protocol they follow. They have to do an assessment or an evaluation of a patient. And they rely upon the same protocol every time so that they get an accurate assessment so that other people, other doctors looking at it can see whether the diagnosis is proper based upon a standard pattern. Similarly, psychologists have a protocol they follow. And in this case, the problem we have is that there was really no discernible protocol prepared, proposed by the evaluator which is Robert Clipper. What he did is he did an assessment with what's called scoring on an MMPI. He did gather some information but from that point, as a template, you couldn't put anything over it to say this is why he decided this uncorroborated information. How was he selected? I believe he was selected by the court and actually at the time I thought it was by agreement of counsel. You weren't trial counsel? I was not trial counsel. It was Angela Donna who I think represented the mother and the father was represented at trial by Rachel Schmidt. So your client on appeals, trial attorney, agreed to Dr. Clipper. I believe that's the case. I believe it because I think Judge Stobbs would not have appointed Dr. Clipper had there not been some agreement on it. So this agreement having been made, this man having been appointed. Was he cross-examined? He was cross-examined by a pro se litigant. I thought you said that your client had an attorney at trial. Not at trial, leading up to trial. Up until that time she did it. At trial itself she didn't have counsel. So her examination, the examination of Robert Clipper was conducted by a pro se litigant. So in the process she did point out certain things that were glaring. And what was glaring was that he didn't follow any kind of discernible protocol. When it came to unsubstantiated allegations made by the father against the mother, pot smoking. She smoked pot. He put it right in. Trial attorney had already withdrawn or quit? I think that trial counsel prior to the beginning of trial was discharged or was withdrew. And I really am not sure. And your client elected to proceed pro se? I believe she elected, I think she proceeded pro se. I'm not sure if at that time she wanted a continuance to get an attorney. I just don't know. But when she did proceed and she did find that he would put through information in this decision making process, whatever it was, that was unsubstantiated, uncorroborated by the husband. But when it came time to things that she had told him that were corroborated, he didn't deem it to be reasonable. And what's significant is it was incidents of physical abuse or domestic violence. Domestic violence has a wide range of possible conduct. According to statute it ranges from harassment by definition all the way to physical violence. She told him there was physical violence. She showed him pictures. She told him about police reports, gave him police reports, which indicated that on especially one occasion she called the police. She was afraid of her husband, who at that time had been drinking in the basement. The gun cabinet was open. He said he was going to kill himself. And when the police arrived, between the time of her call and his arrival, he had gotten into his son's bed. The police officer who testified said it didn't look like he had been sleeping. It looked like he just got there. And he testified that the reason was he wasn't getting up like he was asleep and rubbing his eyes. He just got up, hopped right up, and started talking. When they saw the wife, she was clearly upset. Her face was red. She had been crying. The husband had been obviously drinking. This is according to testimony. And they saw the gun cabinet was open. And when they went downstairs, they saw around the area where he was sitting a lot of beer cans and cigarettes and things indicating that he had been drinking. This information was provided to the therapist evaluator, who concluded or decided at some point that it wasn't relevant. He also testified, however, that domestic violence, he would never recommend custody for someone who was involved in domestic violence. When asked by a pro se litigant on cross-examination, you had this information. Why didn't you include it? He said, well, it wasn't corroboration. She had photos, police reports. Well, it didn't establish a time when he got the bruises. And because I didn't know a time when he got the bruises, I couldn't deem who was from that. The appellee argues that, well, you know, she could have gotten plain violence. Well, there's no one said she got a plain violence. No one accused her. It happened. In your appendix on page 4, the trial court addresses the issue of physical violence by the parties and it appears Judge Stobbs makes the finding that there wasn't a preponderance of evidence to prove physical violence on either person's part. Is that correct? That's correct. And that's one reason we say the ball missed the strike zone. He relied upon the testimony of Dr. Clipper in part coming to that conclusion. Did your client testify to these things in front of the judge? Yes. But he still made this finding after hearing her testimony and hearing the testimony of the other witnesses? Yes, he did. He made that finding. He gave weight to Robert Clipper and he references it in other findings. I think in Factor 4 or 5 he makes reference to Dr. Clipper. He does rely upon him. The problem we have is he gave too much weight and he shouldn't have given any weight to it because it's like if there's no protocol to follow, no rules to follow, it's just a gut reaction from someone. He hasn't followed a professional procedure. It's like taking a – if part of it's tame, you can't tell what the rest of it is like if he hasn't properly processed the information. If you take a drink of sour milk, you don't have to drink the whole jug to know it's bad. We've had a drink of sour milk. This was not properly processed. It was enough – the report was 7 months old and it had been 9 or 10 months since he'd even seen anyone, talked to anyone, investigated anything. Our Supreme Court rules require us to get these things done in 18 months. Well, this 10 months in the youngest child's life is one-fifth of her life before he even talked to her, since he had talked to her, since he had gotten any information. And yet, having that evidence pointed out, he didn't address why he put a higher burden on the wife to prove domestic violence than he did on the husband when he said, hey, she smoked pot. He couldn't explain why corroboration was needed for her but not for him. And it's example after example. Quite frankly, I think she did, for being pro se litigant, she didn't go as far as she could if she didn't address all these. But she did a fairly decent job of bringing out some of the information. The second part, the second strike. Obviously, we're saying that the judge, to the extent he stated he relied upon some of the report in his findings, is relying on a lot of bad information. I know we have a high standard on appeals, especially on something like this, but it doesn't mean it doesn't happen at all. It has to happen somewhere. And when, like the ball that was pitched, when it misses the strike zone, and I'm a Cardinal fan but I knew it missed the strike zone, when the fans in the crowd know it missed the strike zone, that's something that fits that pattern. That's what happened here. The second part is visitation is really considered to be something that's very strong in maintaining that tie. There was testimony also that the mother had been the primary caretaker during the marriage, that the husband had found religion once a final divorce was going through, and he stepped up his game, but historically the mother had been the primary parent. When the mother went back to the place where they all lived, where all the family's in Kentucky, nobody's up here except the dad. When she went back and this order was entered by the court, he reduced her visitation by one half. She was getting every other weekend by temporary order until the court could rule, and he reduced it in half, saying that it's better. The testimony from Dr. Clipper was, well, six hours is too much for children to travel on a weekend, three hours one way and three hours back. Too much time. It doesn't provide any verification, no backing for it, other than the fact he pulled it out of thin air. There's nothing scientific about it. There's nothing professional about it. He just felt that way. So that now if that's the case, then children traveling from Madison County to Peoria or to McLean County or other counties, it's just too far. So we should cut the parent's contact in half. Not just cutting, in this case, the parent's contact in half, cutting the family's contact in half. The entire family on both sides lives where my client lives. Only person up here is dead. The court ignored, in deference to the counselor, information of a lack of cooperation on the part of the father. Ignored because too much emphasis was placed on the testimony of this expert without a protocol. So the two things that we think were striking out of his own that the crowd saw, that if you put a template on it, were the fact that he relied upon him to determine what's a proper custodial parent, and the second, that he gave as a schedule every other weekend. If the mother had properly gotten custody and was going to be in Kentucky, the father should have every other weekend. Three hours isn't too far to travel for children to be with a parent. In fact, sometimes the trip is worth it because you get trapped car time with the kids where you can actually enjoy it. Counselor doesn't address any reason why he came up with this except pulling it out of thin air. Thank you, Your Honor. Thank you, Your Honor. I remember a judge in Kentucky. I objected to some evidence in a divorce hearing once, and he said, no, I'm going to let them vent. They need it. We're in here on essentially a bench trial in a divorce hearing, and I think the Cardinal baseball example is really good. Is it clearly a romance? Is it an abuse of discretion? Two things I'm going to focus on. Number one, what that means. Number two, that at the end of the day these people that are sitting here, divorce cases, have as an overriding goal to do what they think is in the best interest of the children, not always an easy thing to do. Clearly erroneous doesn't mean that if I heard the same case, I would decide differently. This person heard, Judge Stobbs heard, an enormous amount of testimony. I know I read through it all in the transcripts. He had an evaluator. He had several witnesses. You weren't the trial counsel. I was not trial counsel either. No, neither one of us were. At the end of it, he did a really good job of breaking down all the factors in the statute for custody of children that are supposed to end up doing what's in the best interest of the children. Frankly, a person that goes pro se would probably not know this, but a lot of these objections, for instance, protocol, could have been made and he could have been cross-examined on that, but he was not. And I think, given his testimony, he had been involved in 250 to 350 cases, goes toward the fact that he at least has quite a bit of experience in it. He also has the requisite training under the statute to do so. He's not the be-all and end-all of this, though. As far as whether it was timely, there was no objection to that. But the other thing is, trial counsel at some point had agreed on this person. This person, in searching appellate court records in Illinois, has been involved in cases, several, some of which have come before the appellate court. And the thing I started out about Vint, the trial court, in his breaking down the factors, may have mentioned that both parties had done quite a bit of what he called sniping, pointing out flaws of the other. But as is common in divorce cases, these judges have to sit and sift through that, and their overriding goal is not who's necessarily the worst person, but in whose custody would it be in the best interest of the children to reside, primarily. And he makes mention of that in his factors four and five, and just the same as Dr. Klipper testified to, sometimes it's hard to sift through what are just bad feelings and the normal venom in any divorce case and what's really best for the children. I thought it was very interesting that Dr. Klipper, and one reason I think courts use evaluators, is rather than sitting through lengthy bench trials and listing testimonies, a person actually goes and talks to the parties, the children, in a non-adversarial system, not under oath. I'm not saying which kind of information is necessarily better than the other, but it gives the trial court another thing to factor in, which I think he did a good job. But he found that at various points the parties had talked about the other's substance abuse, the other's violence, and yet he didn't find any of that beyond the confidence of the evidence. So in what might have been a close call, he didn't think that it had a bad effect on the way they raised the children. The part of his evaluation I found important was, in talking to the children, they did not describe the parents the way the parents had described each other. And I think that's important. Parents are adversarial at this point. They're going to, it's one versus the other, that's the name of the case. They're going to butt heads. They're going to disagree. These children are not two and three years old. They're a little older. They weren't. I don't know what they told him. Their memories of it were not exactly like the unnecessarily venomous banter back and forth between the two. If you look at the transcripts of this case and read them, you will find a lot of testimony during the bench trial with Judge Stobbs that quite frankly is hateful toward the other, a little bit self-serving, and the kinds of things you normally see in a divorce. However, at the end of the day, he does go look at every factor. Did he rely too much on the evaluator? Now, when he makes that clear in his final ruling, he patiently goes through each factor and in some cases mentions what the evaluator said and others mentions what the parties had said under oath. Now, to go pro se, you're going to proceed at your own peril to some extent. But the job of this court is not to look back and go, oh, we would have decided it differently. I agree with Mr. Fennerkamp on whether it's clearly erroneous. You can't look back and go, I might have thought differently. You've got to look at this from this perspective. He heard testimony. He had an evaluator. He had exhibits. He had a history of these parties and other hearings at which at some point each party had one child. He had plenty of things to base this on. And the fact that he ruled as he did was not clearly erroneous. It's not subject to being overturned. As far as visitation goes, that was the testimony that he, by Dr. Clifford, that he felt like the travel time had a bad effect on the children. Having not been trial counsel, I don't know exactly what the testimony was on that for him, but that was part of the reason that he did not want them. I think he did one weekend a month rather than what they do where I live, which is typically every other weekend. To which I would say, having driven that, I live in Paducah, having driven that to Edwardsville many, many times, it is a pretty good hike. But my thinking is if that distance was causing me problems because I couldn't see my children as often as I wanted to, you can bring that back to the trial court's attention. I'm not sure that they did that at any point on, for instance, the motion to reconsider or what have you. You're saying that your client would be amenable to voluntarily amending the visitation? Probably. Judge, I'm not the trial counsel. I don't think he has a problem with Hersey anymore. I think he, like that person, had a problem with travel time, which is understandable for children. I understand that. But if they didn't live so far apart, I'm certain he wouldn't have any problem with her. Not that he's trying to keep them from her. We think the decision by the trial court was not purely erroneous. It should not be overruled by this court. Thank you. Thank you, counsel. You're a battle counsel? Yes, I am. Gentlemen, thank you very much for your briefs and arguments. I know it's sometimes difficult not to be trial counsel here, but we do appreciate your arguments today. We'll get back with you as soon as we pop the pen on this bill. Thank you. Sheriff, what else do we have this morning? 11 o'clock. 11 o'clock, okay. We shall be in recess until then.